## A00A1015. SMITH v. THE STATE.
(538 SE2d 517)

RUFFIN, Judge.

James Edward Smith, Jr. was convicted of being a habitual violator for operating a motor vehicle after receiving notice that his license had been suspended. He appeals the denial of his motion to suppress, arguing that the traffic stop was not supported by articulable suspicion. For reasons discussed below, we reverse.

Officer Perry Foutz of the Cobb County Police Department testified that he was on patrol shortly after midnight on November 11, 1998. He said that there had been "numerous burglaries and entering automobiles" in the apartment complexes along Powers Ferry Road, and that he had been told to "step up the zone patrols of the area." As he was checking the buildings inside the Oaks Apartments complex, he saw a car "that was stopped, and kind of pulled off to the right, and it had its brake lights on." He testified that the vehicle was

not impeding traffic, but that he did not believe it was in a parking space. He said that "[m]ost of the other vehicles were parked in parking spaces. I don't remember seeing any others pulled over in that fashion."

When Foutz first saw the vehicle, it was approximately 100 yards away. The complex was dimly lit, and Foutz could not tell what kind of car it was. Foutz drove toward the car, but did not activate his blue lights. When he was about 25 yards away, the car "pulled off [and] then turned right onto Powers Ferry Road." Foutz testified that he "probably" could not tell what kind of car it was from 25 yards away. When asked to describe how the car pulled away, Foutz said "[i]t was quickly, but, I mean, he didn't spin his tires. It was not a, you know, slowly moving out of the area. It was a quick exit of the complex." Foutz testified that the speed limit in the complex was 10-15 mph, and that the car did not violate any traffic laws. Foutz followed the car and stopped it on the corner of Powers Ferry Road and Delk Road. According to Foutz, the driver, Smith, "told me that he was dropping his girlfriend off, which eventually turned out to be the case."

When asked why he stopped Smith's vehicle, Foutz responded, "Reasonable suspicion. The time of day. The pulling off when I got behind him. The frequency of burglaries and entering autos in the complexes up and down Powers Ferry Road in the previous days and weeks." He testified that patrolling the apartment complexes was part of his routine job, but that "when you have a rash of entering autos and burglaries you step up the zone patrol for that area." When asked about the rash of crimes, he could not provide any specific details, stating that "[a]ll I know is I was advised at squad meetings that we had had several in the complexes up and down Powers Ferry Road, and that we were to check those." He did not know whether there had been any incidents at the Oaks Apartments, and had not been given a description of any burglars or vehicles involved.

Foutz testified that he did not see Smith commit any traffic violations before the stop. He also provided the following testimony:

Q. Prior to stopping [Smith], did you have any specific reason, any specific reason that he had violated the law prior to you pulling him over?
A. It raised a suspicion that when I come up behind him he pulled off. Based on the time of day and the previous incidents in the area.
Q. My question is, did you have any specific reason?
A. No, I didn't see him running out of an apartment, or anything like that.
Q. And did you have any specific reason, and I mean specific

reason that he was about to violate the law when he pulled out of the complex?

A. No, I did not.

The trial court denied Smith's motion to suppress, holding that

in light of the lateness of the hour, the reports of criminal activity in the area, the nonapparent reason for the stopped vehicle, and the abrupt departure of the vehicle as the patrol car approached, Officer Fout[z] had a reasonable articulable suspicion that Defendant was engaged in or about to engage in a criminal act.

In reviewing the grant or denial of a motion to suppress, the factual findings of the trial court will not be disturbed unless they are clearly erroneous.[1] However, the application of the law to the facts is subject to de novo review.[2]

An investigative stop of a vehicle "must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[3] The officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[4] While the officer's suspicion "need not meet the standard of probable cause, [it] must be more than mere caprice or a hunch or an inclination."[5] An "unparticularized suspicion or hunch" is insufficient to justify an investigative stop of a vehicle.[6]

The simple fact that Smith was parked in an apartment parking lot late at night and then left the complex in the manner in which he did is clearly not sufficient to create a "particularized and objective" basis for suspecting involvement in criminal activity. This situation is similar to *Attaway v. State*,[7] in which the police received reports that a car was circling around a subdivision several times late at night. An officer followed the car for a while and then stopped it as it was on a road leading out of the subdivision. We held that the stop was not supported by articulable suspicion, noting that

[n]o evidence was introduced that such activity violated any

---

[1] See *Lambropoulous v. State*, 234 Ga. App. 625 (507 SE2d 225) (1998).

[2] See *State v. Winnie*, 242 Ga. App. 228, 229 (529 SE2d 215) (2000).

[3] (Punctuation omitted.) *Hughes v. State*, 269 Ga. 258, 259 (1) (497 SE2d 790) (1998).

[4] (Punctuation omitted.) Id. at 260.

[5] (Punctuation omitted.) *Jorgensen v. State*, 207 Ga. App. 545, 546 (428 SE2d 440) (1993).

[6] (Punctuation omitted.) Id. See also *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 20 LE2d 889) (1968).

[7] 236 Ga. App. 307 (511 SE2d 635) (1999).

local ordinance or other applicable law, or that there was any other basis for the stop. While the police officer testified that there had been past incidents of vandalism in the area, the police received no information that Attaway had committed any such acts. Although . . . the police might have been justified in closely observing Attaway's actions, his behavior did not provide a particularized and objective basis for suspecting him of criminal activity sufficient to justify an investigatory stop.[8]

In *State v. Winnie*,[9] an officer saw a truck pull into the parking lot of a closed business at 4:00 in the morning. When the officer pulled in to investigate, the truck started to pull away, and the officer stopped it. We held that, although the officer might have suspected a potential burglary when the truck pulled into the closed business, the basis for such a suspicion disappeared when the truck began to leave. We upheld the trial court's determination that there was no evidence of flight, noting that the officer did not testify that the driver appeared to see the police vehicle.[10]

The State contends that Smith's "sudden" departure from the complex constituted "unprovoked flight," thus justifying an investigative stop. It relies primarily upon the U. S. Supreme Court's recent decision in *Illinois v. Wardlaw*.[11] In that case, a four-car police caravan was converging on an area known for heavy drug activity, and the officers "anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts."[12] An officer in the last car saw the defendant standing next to a building holding an opaque bag. The defendant looked in the direction of the officers and then began to flee. The officers followed him as he ran through a gangway and an alley, and eventually cornered him on the street, where they discovered a gun in the bag he was carrying.

The Supreme Court stated that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[13] However, the Court noted that

it was not merely [the defendant's] presence in an area of heavy narcotics trafficking that aroused the officers' suspi-

---

[8] (Citation and punctuation omitted.) Id. at 309.
[9] Supra.
[10] Id. at 230-231.
[11] 528 U. S. 119 (120 SC 673, 145 LE2d 570) (2000).
[12] Id., 120 SC at 676.
[13] Id.

cion but his unprovoked flight upon noticing the police. Our cases also have recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight — wherever it occurs — is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it [may be] suggestive of such. . . . Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.[14]

The Court concluded that the police were justified in suspecting that the defendant was involved in criminal activity.

The State also relies on two Georgia cases holding that a defendant's flight justified a police stop. In *Harris v. State*,[15] police officers were patrolling a "known drug area." The defendant and several other individuals saw the patrol car and then began running. One of the officers testified that, in his experience, when the police patrol "high drug areas," individuals with drugs on their persons usually run upon the arrival of the police. We held that "[the defendant's] flight after observing the police car gave the officers sufficient articulable suspicion to conduct a *Terry* 'stop and frisk.' "[16]

In *State v. Savage*,[17] a police officer was on foot patrol around 2:00 a.m. in a "known drug area." The officer saw a truck drive through the area several times in a 15-minute period, and then pull over to the curb and stop. A pedestrian approached the vehicle, spoke with the driver (the defendant), and "made a gesture which alerted defendant to the officer's presence."[18] The defendant then "drove away after being alerted to the presence of" the officer, and was stopped by another officer.[19] We reversed the grant of the defendant's motion to suppress, stating that the

defendant's actions of bringing to a halt what had been transpiring between him and the person with whom he was engaged, and distancing himself from that person and from the police when alerted to the latter's presence, was an objective manifestation of guilt. There is no significant distinction between the facts in the case sub judice and those in other cases wherein we have held that flight upon the

---

[14] (Citations omitted.) Id.
[15] 205 Ga. App. 813, 814 (1) (423 SE2d 723) (1992).
[16] Id.
[17] 211 Ga. App. 512 (439 SE2d 738) (1993).
[18] Id.
[19] Id.

approach of patrolling police officers in high crime areas provided articulable suspicion for a *Terry* stop.[20]

The present case is distinguishable from each of the above cases in several respects. First, although Foutz had been told that there had been "several" burglaries and automobile break-ins at nearby apartment complexes, the evidence does not show that the Oaks Apartments was a "high crime area" in the sense contemplated by *Wardlaw* and the Georgia cases — i.e., an area where the police could anticipate finding ongoing criminal activity. As Foutz testified, patrolling the apartments along Powers Ferry Road was part of his routine duties, although such patrols had been "stepped up" due to recent incidents. There is no evidence that Foutz had any particular reason to suspect ongoing criminal activity at the apartment complex on the night in question.

Moreover, unlike in the above cases, there was no evidence that Smith even noticed Foutz's patrol car before leaving the complex. Foutz testified that the parking lot was dimly lit, and he could not identify Smith's car at a distance of 25 yards. Foutz did not activate his blue lights, and did not claim that Smith pulled away because he saw the patrol car. Although Foutz characterized Smith's departure as "a quick exit of the complex," he testified that the speed limit in the complex was 10-15 mph and that Smith did not violate any traffic laws. Thus, Smith's departure was not the kind of "headlong flight" from a "high crime area" after noticing the police that occurred in *Wardlaw* and the other cases.

If Foutz had had a more particularized reason to be suspicious of Smith's car before it pulled away, Smith's departure might have been a relevant factor in causing Foutz to suspect involvement in criminal activity. However, it is not illegal, nor even particularly suspicious, for a vehicle to be stopped briefly in the parking lot of a large apartment complex around midnight. Such conduct is at least as consistent with what was in fact transpiring — i.e., Smith dropping off his girlfriend — as with anything sinister. Foutz did not claim that the vehicle had been parked for an inordinately long time, and in fact only observed the vehicle for about 15 seconds. He saw nothing during those 15 seconds to indicate any kind of ongoing criminal activity, and admitted that he had no "specific reason" to think that Smith had broken or was about to break the law. Given the lack of any particular reason to be suspicious of the parked car in the first place, the fact that it pulled away was insufficient for the officer to conclude that the driver was in headlong flight, particularly in the absence of

[20] Id. at 513.

any evidence that the driver even noticed the patrol car.

In short, the evidence shows that Officer Foutz did not have a "particularized and objective" reason for believing that Smith was involved in criminal activity. Rather, Foutz's decision to stop the vehicle was based simply on an "unparticularized suspicion or hunch," which is not sufficient to justify an investigative stop.[21] Accordingly, the trial court erred in denying Smith's motion to suppress.

*Judgment reversed. Andrews, P. J., and Ellington, J., concur.*

DECIDED AUGUST 21, 2000.

*Steven A. Cook*, for appellant.

*Patrick H. Head, District Attorney, Laura J. Murphree, Maria B. Golick, Dana J. Norman, Assistant District Attorneys*, for appellee.