## A08A0332. DARDEN v. THE STATE.
(666 SE2d 559)

ADAMS, Judge.

Bobby Darden appeals following the denial of his motion for new trial after he was convicted of one count of trafficking in cocaine and one count of possession of marijuana with intent to distribute.

128

Darden asserts that the trial court erred in denying his motion to suppress, in denying his *Batson* motion on the ground of race and in admitting impermissible hearsay testimony. He further argues that he received ineffective assistance of counsel at trial. For the reasons set forth below, we affirm.

On June 11, 2003, Officer Anthony Smith, a task force agent working with the Drug Enforcement Administration, was conducting surveillance on an apartment complex in Gwinnett County, along with other members of the task force. The officers were acting on information that a white Lincoln Navigator had been involved in several drug transactions.[1] After a white Navigator driven by Darden pulled out of the complex, Officer Smith followed it to a nearby McDonald's restaurant. Darden pulled into the parking lot, and a man and a woman got out of a Nissan Pathfinder and into the back seat of the Navigator. Darden drove to where a large tractor-trailer was parked, and backed the Navigator into a space beside the truck. Officer Smith pulled his unmarked car on the other side of the parking lot, directly facing the Navigator, where he had an unobstructed view and could see inside the vehicle.

Smith saw Darden turn toward the back seat and then observed what appeared to be an exchange between the occupants of the car. Although Smith could see the occupants' bodies, he did not have a close-up view of their hands and could not see what was exchanged. A few minutes later, Darden drove back to the couple's Nissan, where they jumped out of the back seat and jumped into their own car. Both vehicles exited the parking lot very hurriedly. Smith determined, based upon his training and experience as a drug enforcement officer, that he had witnessed a drug transaction. He followed the Nissan and pulled the car over. Officer Smith advised the driver, Patricia Winderweedle, that he had observed her transaction with Darden. She denied this at first, but then admitted to a drug transaction after Smith told her that he had seen what had happened. At trial, Winderweedle testified that she admitted the drug transaction after Smith told her that it would be better for her if she cooperated because he had a female officer and a drug dog on the way. She then removed approximately an ounce of powder cocaine from inside her shirt and gave it to Smith, saying she had paid Darden $850 for it.

Smith gave this information to the other task force officers, and they stopped Darden's car. Smith arrived on the scene shortly after they pulled him over. After police read Darden his *Miranda* rights,

---

[1] The information received apparently reported that the Navigator was being driven by a Hispanic male, and Darden is an African-American. But Officer Smith stated that the focus of the investigation was the white Navigator.

they searched him and found $800 and a bag of marijuana, as well as an additional $150 in the car. Darden told police that he would cooperate, but asked to return to his apartment so his customers would not see him getting arrested. When police told him that they would have to look around his apartment, he said "y'all can look around," although he refused to sign the written consent form because his attorney had told him never to sign such a form. He also stated that he was selling drugs at the time to raise money because his girlfriend was pregnant. Police drove Darden back to his apartment to conduct a search. During that search, police found marijuana and cocaine in plain view on a counter, a safe, a loaded pump shotgun behind the couch, handguns, a scale, and over $2,400 in cash. Police asked Darden for the combination of the safe. He refused but said that he would open it for them. Inside, police found a substance that appeared to be methamphetamine.

Darden testified at the hearing on his motion to suppress and denied that he ever gave the officers consent to search his apartment. Instead, he said that he asked to call his lawyer. Darden also said that he only agreed to open his safe for the officers after they threatened to "bust it open."

1. Darden first asserts that the trial court erred in denying his motion to suppress the evidence, because it was obtained by way of illegal traffic stops.

> In considering [the] denial of a motion to suppress, this Court construes the evidence in favor of the trial court's ruling, and we review de novo the trial court's application of the law to undisputed facts. Additionally, we must defer to the trial court's determination on the credibility of witnesses, and the trial court's ruling on disputed facts must be accepted unless it is clearly erroneous. Moreover, in reviewing the denial of a motion to suppress, we consider all the evidence of record, including evidence introduced at trial.

(Citation and footnote omitted.) *Jackson v. State*, 280 Ga. App. 716, 716-717 (634 SE2d 846) (2006).

(a) Darden asserts that the initial traffic stop of Winderweedle was illegal because the officer's observations of her activity were inadequate to give rise to reasonable suspicion of wrongdoing sufficient to justify stopping her vehicle. Similarly, Darden argues that police lacked reasonable suspicion of wrongdoing to justify the stop of his own car. He further asserts that these traffic stops tainted his verbal consent to search his apartment. We disagree.

Although an officer may conduct a brief investigative stop of a vehicle, such a stop must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. Investigative stops of vehicles are analogous to Terry[2]-stops, and are invalid if based upon only unparticularized suspicion or hunch. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. This suspicion need not meet the standard of probable cause, but must be more than mere caprice or a hunch or an inclination.

(Footnote omitted.) *Terry v. State*, 283 Ga. App. 158, 158-159 (640 SE2d 724) (2007). Therefore, "[e]ven if there is no probable cause to arrest for a traffic or other offense, the Fourth Amendment allows police to stop a vehicle to investigate a reasonable suspicion of criminal activity." (Footnote omitted.) *Baker v. State*, 277 Ga. App. 520, 521 (1) (627 SE2d 145) (2006).

Moreover, courts must consider all the facts and circumstances of a particular case in considering the legality of an investigative stop:

In determining whether a stop was justified by reasonable suspicion, the totality of the circumstances — the whole picture — must be taken into account. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.

(Citations and punctuation omitted.) *Lambright v. State*, 226 Ga. App. 424, 426 (487 SE2d 59) (1997).

In this case, police were acting upon information that a white Navigator was involved in illegal drug transactions, and set up surveillance in the apartment complex to investigate this information. The officers observed Darden pulling out of the complex in a white Navigator and drive to a nearby McDonald's restaurant. Two people got out of their car and into the back of Darden's car. He pulled to a relatively sheltered spot in the parking lot. Officer Smith then observed what appeared to be an exchange. Darden immedi-

---

[2] *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 20 LE2d 889) (1968).

ately drove the two back to their car, and both vehicles drove hurriedly away. None of the three transacted business with the McDonald's or the surrounding businesses.

At the time of this incident, Officer Smith had been a police officer for approximately sixteen years, and had been working undercover investigating hand-to-hand drug sales for approximately five years. He stated that in his experience it was not uncommon for illegal drug transactions to occur inside vehicles in public parking lots. Such a location provides easy access to the street in case something happens, and the public nature of such a site reduces the potential for violence. An automobile provides the most private venue within such a public area to conduct an illegal transaction. Based upon this knowledge, Officer Smith believed that he had witnessed a drug transaction.

We find, in considering the totality of the circumstances, that Officer Smith was acting on more than "mere caprice or a hunch or an inclination."[3] Rather, he articulated sufficient facts to give rise to a reasonable suspicion of criminal conduct. Although there was no evidence that this incident occurred in a known drug area, the officers were acting on information that tied the white Navigator to illegal drug activity. They confirmed this information by observing Darden engage in actions typical of a drug transaction while in his Navigator. Even though they did not actually see drugs change hands, we find that the circumstances were sufficient to justify Officer Smith's investigative stop of Winderweedle's vehicle. See *Holden v. State*, 241 Ga. App. 524, 526-527 (527 SE2d 237) (1999) (defendant's stop of vehicle in known drug area to speak with admitted drug dealer sufficient even though police did not see drugs change hands); *Thompson v. State*, 230 Ga. App. 131, 132 (495 SE2d 607) (1998) (police observation of attempted exchange of "something" in middle of street in high drug area and leaving "skiddishly" supported investigative stop); *Lambright v. State*, 226 Ga. App. at 426 (1) (police observation of hand-to-hand exchange of "something" in high crime area sufficient to support stop); *State v. Savage*, 211 Ga. App. 512, 513 (439 SE2d 738) (1993) (officer's observation of truck's driver stopping to talk to pedestrian in known drug area and driving away after being alerted to officer's presence supported investigative stop of truck).[4]

(b) Darden also claims that the evidence should have been

---

[3] *Terry v. State*, 283 Ga. App. at 159.

[4] Compare *Smith v. State*, 245 Ga. App. 613 (538 SE2d 517) (2000) (stop not justified where defendant merely parked in general area of reported burglaries and drove off hurriedly, where nothing tied him to illegal activity); *State v. Fowler*, 215 Ga. App. 524 (451 SE2d 124) (1994) (stop not justified where officer testified that he based decision on suspicion, not on anything specific that he observed).

suppressed because Officer Smith impermissibly coerced Winder-weedle to relinquish the cocaine inside her shirt by representing that a drug dog and a female officer were on the way. He asserts that her decision to admit to the drug transaction was merely an "acquies-cence to a claim of lawful authority," and not voluntary consent. See *State v. Jones*, 269 Ga. App. 325, 326 (604 SE2d 228) (2004).

But Darden did not raise this argument before the trial court, and it is waived for purposes of appeal. *Shaw v. State*, 247 Ga. App. 867, 869 (1) (545 SE2d 399) (2001) ("[i]t is well settled that a reason urged by enumeration of error on appeal which is different from that urged below will not be considered for the first time on appeal") (footnote omitted). Even if Darden had properly preserved this issue below, however, we find that the officer's statement did not amount to impermissible coercion so as to render Winderweedle's admission or her voluntary relinquishment of the cocaine invalid. Even if the officer suggested that it would be in her best interest to cooperate because he had called a drug dog and a female officer to the scene, we find that this statement did not amount to an improper attempt to induce cooperation by claiming he had the lawful authority to search either her or her car if she refused to cooperate.[5] See *Kates v. State*, 271 Ga. App. 326, 328 (1) (609 SE2d 710) (2005); *Palmer v. State*, 257 Ga. App. 650, 653-654 (2) (572 SE2d 27) (2002); *Cole v. State*, 254 Ga. App. 424, 425-426 (2) (562 SE2d 720) (2002).

(c) Thus, we disagree with Darden's assertion that the investi-gative stop of his car was illegal and his subsequent consent to search was tainted. The same facts that provided justification for an investigative stop of Winderweedle's vehicle also supported the stop of Darden's vehicle. In addition, at the time of that stop, police had Winderweedle's statement that she had just purchased cocaine from Darden for $850, as well as the cocaine itself. Thus, no illegality existed to taint Darden's consent to search his apartment. See *Miller v. State*, 287 Ga. App. 179, 180-181 (1) (651 SE2d 103) (2007).

Accordingly, the trial court properly denied the motion to suppress.

2. Darden also claims that he received ineffective assistance of trial counsel when his attorney failed to renew the motion to suppress after Winderweedle testified that she admitted the drug transaction only after police told her that it would be better for her

---

[5] On direct examination, Winderweedle testified only that the officer said he had a drug dog and a female officer on the way; there was no mention that he threatened to search her. On cross-examination, Darden's attorney extended her testimony by asking "it wasn't until he told you there was a female officer coming *to search you* and dogs coming that you said you had the drugs on you?" While Winderweedle responded in the affirmative, she never specifically asserted that the officer threatened to search her, nor was she asked what she understood the officer's comment to mean.

if she cooperated because a female officer and a drug dog were on the way.

> To establish an ineffective assistance claim, an appellant must show both that his trial counsel's performance was deficient and that counsel's deficiency so prejudiced his defense that a reasonable probability exists that the outcome of the trial would have been different but for counsel's errors.

(Citation, punctuation and footnote omitted.) *Mitchell v. State*, 287 Ga. App. 517, 518 (1) (651 SE2d 821) (2007). Thus "[w]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." (Citation omitted.) *Richardson v. State*, 276 Ga. 548, 553 (3) (580 SE2d 224) (2003). Given our holding in Division 1 (b) above that the officer's statement did not amount to improper coercion, Darden cannot show that it is likely that a renewed motion to suppress on this ground would have been successful, and he thus "has failed to make the strong showing necessary to establish ineffective assistance." Id.

3. Darden next argues that the State exercised its peremptory strikes in a racially discriminatory manner to remove three African-Americans and another individual who Darden describes as a "juror of color" in violation of *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). "To prevail on [his *Batson*] motion, he had the burden of proving that the State engaged in purposeful racial discrimination in the exercise of its peremptory strikes and, on appellate review, the trial court's finding that he did not meet that burden is entitled to great deference." (Citation omitted.) *Taylor v. State*, 279 Ga. 706, 707 (3) (620 SE2d 363) (2005). "As . . . a trial court's decision on a *Batson* motion 'rests largely upon assessment of the prosecutor's state of mind and credibility; it therefore lies peculiarly within a trial judge's province.' " *Reedman v. State*, 265 Ga. App. 162, 169 (12) (593 SE2d 46) (2003). Accordingly, this Court applies a clearly erroneous standard in reviewing the trial court's denial of Darden's *Batson* motion. *Jones v. State*, 261 Ga. App. 698, 700 (2) (583 SE2d 546) (2003).

At issue are the State's strikes of Jurors No. 5, 13 and 21, who are African-American and Juror No. 11, whose race is unclear from the transcript. We note that the voir dire in this case was not transcribed, and the only description in the record of these jurors and their voir dire testimony comes from the recollections of counsel and the trial judge during the hearing on the *Batson* motion and the motion for new trial.

The prosecutor explained that he struck Juror No. 5 because the juror testified about a bad experience with police and a bad experience his mother recently had with a prosecutor, which landed her in jail for five days. The juror also had a back problem, for which he was on medication. The prosecutor was concerned that the juror's back condition would distract him from the trial. Juror No. 13 was a former associate pastor, who had been extensively involved with prison ministries, and Juror No. 11 was a priest. The prosecutor believed that based upon their professional experiences, these jurors would tend to be sympathetic to the defendant. The prosecutor struck Juror No. 21 because she had related a prior bad experience with police. In that incident, she was pulled over with her three children and detained for two hours for what she believed was absolutely no reason. The prosecutor's notes reflected that the juror said that the police "were extremely out of control." In addition, she had an uncle who was shot in the back leaving a crack house and other uncles who had been charged with possession of controlled substances with intent to distribute. The prosecutor was concerned about the juror's prior experience and the number of the juror's family members who had been in trouble with the law.

Darden's trial attorney responded that other members of the jury panel also had relatives with bad experiences with police and one other juror had conducted a service at a friend's prison ministry. The trial court determined, however, that the bad experiences of Jurors No. 5 and 21 differed significantly in degree from the experiences described by the other jurors. The judge also recalled that unlike Juror No. 13, the other juror had served on only one occasion at a prison ministry and the judge felt "by the tenor of [the juror's] remarks, that he was almost embarrassed at having done it." The trial judge concluded, therefore, that the State had offered appropriate race-neutral reasons for the strikes at issue. In the absence of a voir dire transcript, we must presume that the trial court's conclusions were correct. See *Jackson v. State*, 281 Ga. App. 506, 509-510 (2) (636 SE2d 694) (2006). And considering the State's explanations for its strikes, we cannot say that the trial court's denial of the *Batson* challenge was clearly erroneous. See *Reedman v. State*, 265 Ga. App. at 169 (12).

4. Darden further argues that the trial court erred in allowing a forensic chemist from the Georgia State Crime Lab to testify regarding testing done by another analyst at the lab, who was unavailable to testify at trial. He asserts that such testimony was inadmissible hearsay.[6]

---

[6] Generally, the decision whether to admit evidence is a matter committed to the trial

James Conrad Roberson, a forensic chemist from the crime lab, was qualified as an expert on behalf of the State and testified, over objection, that substances obtained from Darden's apartment were tested and identified as cocaine. Roberson had been qualified "hundreds of times" as an expert witness in chemical analysis, and had testified in that capacity at trial. The tests in this case, however, were actually performed by Tonay Bailey, another forensic chemist at the lab who was on maternity leave and thus unavailable to testify. Her analysis had been peer-reviewed, meaning that it was double-checked by another analyst at the lab to confirm that conclusions in Bailey's report were correct and contained no errors. Roberson described the techniques that Bailey used in her analysis and testified that after examining the raw data from these tests, he came to the independent conclusion that the material was cocaine.

We addressed a nearly identical situation in *Byrd v. State*, 261 Ga. App. 483 (583 SE2d 170) (2003), and held that the trial court did not err by allowing an expert to testify based upon his observations of data collected by another forensic analyst. We noted that "where an expert personally observes data collected by another, his opinion is not objectionable merely because it is based in part on the other's findings." (Citations and punctuation omitted.) Id. at 484. Moreover,

> [e]ven when an expert's testimony is based on hearsay, the lack of personal knowledge on the part of the expert does not mandate the exclusion of the opinion but, rather, presents a jury question as to the weight which should be assigned the opinion. The evidence should go to the jury for whatever it's worth.

(Citation, punctuation and footnote omitted.) *Jackson v. State*, 257 Ga. App. 857, 859 (2) (572 SE2d 703) (2002). Accordingly we find no abuse of discretion.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED JUNE 25, 2008 —
RECONSIDERATION DENIED JULY 31, 2008 — 

*James M. Miskell*, for appellant.

---

court's sound discretion, and this Court will not disturb that decision on appeal absent an abuse of that discretion. *Knox v. State*, 290 Ga. App. 49, 53 (2) (658 SE2d 819) (2008).

*Daniel J. Porter, District Attorney, Christa L. Kirk, Assistant District Attorney*, for appellee.